JOHN W. HUBER, United States Attorney (#7226)
KEVIN L. SUNDWALL, Assistant United States Attorney (#6341)
JAMIE THOMAS, Assistant United States Attorney (#9420)
CY H. CASTLE Assistant United States Attorney (#04808)
Attorneys for the United States of America
111 South Main Street, Ste. 1800 • Salt Lake City, Utah 84111
Telephone: (801) 524-5682

FILED US District Court -UT
OCT 22 '20 PM03:34

SEALED

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>YEVGENY FELIX TUCHINSKY, ALEXSANDER VASILIYEVICH BARSUKOV, KONSTANTIN MIKHAYLOVICH TOMILIN, LEONID ISAAKOVICH TEYF, FELIX TSIPELZON, and RYAN MOWER,<br><br>Defendants. | SUPERSEDING INDICTMENT<br><br>CASE NO. 2:19CR394 DB<br><br>VIOLATIONS:<br><br>Count 1: 18 U.S.C. §§ 1343 and 1349 (Wire Fraud Conspiracy)<br><br>Counts 2-12: 18 U.S.C. §§ 1956(a)(1)(A)(i) and 2 (Promotional Money Laundering)<br><br>Counts 13-23: 18 U.S.C. §§ 1957 and 2 (Money Laundering - Spending) |

The Grand Jury alleges:

## **BACKGROUND**

At all times relevant to the Superseding Indictment:

1.      FedEx Ground Package System, Inc., more commonly known as FedEx

Ground ("FXG"), was a package transportation and delivery company headquartered in

Pennsylvania. FXG operated throughout the United States, including Utah. It was a subsidiary of FedEx Corp., headquartered in Tennessee.

2. To move packages across the country, FXG operated approximately thirty-nine hubs, or distribution centers, across the United States.

3. One of FXG's hubs was located in North Salt Lake, Davis County, Utah.

4. As part of its business model, FXG contracted with local trucking companies, known as contracted service providers ("CSPs"), to transport packages on behalf of FXG.

5. YEVGENY "EUGENE" FELIX TUCHINSKY ("TUCHINSKY") was a resident of Salt Lake County, Utah and/or San Diego County, California.

6. ALEXSANDER "ALEX" VASILIYEVICH BARSUKOV ("BARSUKOV") was a resident of Davis County, Utah, Salt Lake County, Utah and/or San Diego County, California.

7. KONSTANTIN MIKHAYLOVICH TOMILIN, aka KOT KOTOV, ("TOMILIN") was a resident of Moscow, Russia, Salt Lake County, Utah and/or Bucks County, Pennsylvania.

8. LEONID ISAAKOVICH TEYF ("TEYF") was a resident of Raleigh, North Carolina.

9. FELIX TSIPELZON ("TSIPELZON") was a resident of Salt Lake County, Utah.

10. RYAN LEE MOWER ("MOWER") was a resident of Davis County, Utah.

11. MOWER was the Senior Linehaul Manager at the North Salt Lake FXG hub. He was FXG's highest-ranking employee in Utah from at least 2008 to October 2019. His primary responsibilities included overseeing the FXG CSPs and ensuring each complied with FXG policies and regulations.

12. Currently uncharged Co-Conspirator 1 (hereinafter "UCC-1") was a resident of Morgan County.

13. Currently uncharged Co-Conspirator 2 (hereinafter "UCC-2") was a resident of Salt Lake County.

14. SL Trucking Group LLC was originally incorporated in Utah in 2015. In 2017, the name was changed to Salt Lake Trucking Group ("SLTG"). SLTG and any of its subsidiaries or affiliates were companies doing business in the state of Utah.

15. Defendants TUCHINSKY and BARSUKOV were owners of various trucking companies and started many of the companies now comprised as SLTG. In or about 2012, TOMILIN, and later in or about 2014, TEYF, purchased part of the companies known as SLTG.

16. In 2012, TOMILIN invested with TUCHINSKY and BARSUKOV in SLTG, while TOMILIN was operating businesses in Russia. TOMILIN invested in the various trucking companies in Utah in exchange for a percentage ownership interest in the trucking companies and to receive a share in the future profits derived from the trucking companies. In or about 2012, TOMILIN invested at least $800,000 with TUCHINSKY and BARSUKOV to become a one-third owner of the various FedEx

Ground trucking companies being operated by TUCHINSKY and BARSUKOV in Utah.

17.     In or about 2014, TEYF also invested in SLTG while he was involved in businesses both in Russia and the United States.  TEYF invested approximately $2,400,000 into SLTG.  This amount was split equally amongst the then existing SLTG owners, TUCHINSKY, BARSUKOV, and TOMILIN.  Each of the owners received $800,000 from TEYF's initial investment payment.  In exchange, TEYF acquired a 25% interest in the various FedEx Ground trucking companies that were owned and operated by TUCHINSKY, BARSUKOV and TOMILIN.

18.     SLTG is divided into two divisions, the SLTG FedEx Ground Division ("SLTG Ground") and the Over the Road Division ("SLTG Road").  SLTG Ground is a group of trucking companies that contracts to carry packages for FedEx Ground.  SLTG Ground is comprised of the following companies:

19.     Eugene Trucking, Inc. was incorporated in the State of Utah on or about June 9, 2010.

20.     A & Y Transportation, Inc. ("A&Y") was incorporated in the State of Utah on June 9, 2010.

21.     A & B Transportation, Inc. ("A&B") was incorporated in the State of Utah on June 9, 2010.

22.     Costa Transportation, Inc. ("Costa") was incorporated in the State of Utah on or about October 30, 2012.

23.     Falanga Transport, Inc. ("Falanga") was incorporated in the State of Utah

on or about February 6, 2012.

24.     Big Dogs Transport, Inc. ("Big Dogs") was incorporated in the State of Utah on or about April 16, 2015.

25.     Fusion Transport, Inc. ("Fusion") was incorporated in the State of Utah on or about July 23, 2015.

26.     American Star Transport, Inc. ("American Star") was incorporated in the State of Utah on or about March 25, 2016.

27.     Perun Transportation, Inc. ("Perun") was incorporated in the State of Utah on or about March 11, 2013.

28.     Lana Logistics ("Lana") was incorporated in the State of Utah on or about April 3, 2013.

29.     In or about 2010-2011, TSIPELZON, a former truck driver, became the Manager of SLTG Ground. In this position, TSIPELZON had the primary day to day responsibilities of running SLTG Ground. In approximately 2015, TSIPELZON became part owner of Big Dogs and Fusion.

## BRIBERY AND WIRE FRAUD SCHEME

### Count 1
18 U.S.C. § 1349
(Wire Fraud Conspiracy)

30.     Paragraphs 1-29 are incorporated by reference as though fully set forth herein.

31.     Beginning sometime in and around 2009 and continuing until the present,

in the Central Division of the District of Utah and elsewhere,

YEVGENY TUCHINSKY,
ALEXSANDER BARSUKOV,
KONSTANTIN TOMILIN,
LEONID TEYF,
FELIX TSIPELZON, and
RYAN MOWER,

defendants herein, along with UCC-1 and UCC-2, and others known and unknown to the

grand jury, did knowingly and willfully combine, conspire, confederate, and agree with

each other, to devise and intend to devise a scheme and artifice to defraud and to obtain

money or property, by means of material false and fraudulent pretenses, representations,

and promises, and to transmit and cause to be transmitted by means of wire

communication in interstate commerce, any writings, signs, signals, pictures, and sounds

for the purpose of executing the scheme and artifice to defraud, in violation of 18 U.S.C.

§§ 1343 and 1349.

## OBJECT OF THE CONSPIRACY

32.     The main object of the conspiracy to defraud FXG by TUCHINSKY,

BARSUKOV, TOMILIN, TEYF, TSIPELZON ("SLTG co-conspirators") and MOWER

was to exploit MOWER's position within FXG in order to unfairly grow, give undue

preferential treatment to, and protect the SLTG co-conspirators' trucking operations so as

to make the many SLTG's businesses as lucrative as possible thereby enriching the

SLTG co-conspirators.

33.     Sometime beginning in and around late 2009, the SLTG co-conspirators

began paying MOWER bribes. In exchange, the SLTG co-conspirators asked for and received favors, preferential treatment, and assistance in defrauding FXG.

34.　FXG has a strict no bribery policy in order to promote a culture of honesty and integrity. As part of the CSP contract, FXG reserves the right to terminate a CSP's contract if the CSP engages in bribery or corruption.

35.　When the co-conspirators signed their contracts with FXG, they agreed to conduct all business activities with honesty and integrity, and to comply with all federal, state and local laws. They also agreed that FXG could terminate the contract if either they or the CSPs violated any of these provisions of the contract.

36.　MOWER understood that accepting bribes would result in FXG terminating his employment.

37.　Since at least the fall of 2009, the SLTG co-conspirators and MOWER hid their corrupt relationship from FXG.

38.　In return for money, the SLTG co-conspirators exploited MOWER's position at FXG to fraudulently grow and maintain their businesses in several ways.

## MANNER AND MEANS OF THE CONSPIRACY AND OVERT ACTS

### Fraudulently Obtaining and Retaining Assigned Runs

39.　The SLTG co-conspirators used MOWER's position to game FXG's process governing the awarding of new runs to FXG CSPs.

40.　A run is an overland trucking route between two or more places, between

which FXG needs packages transported by a CSP. Some runs exist only for a day. Others runs are permanent due to the steady flow of packages between locations. A permanent run is called an assigned run. As demand grows, FXG creates additional assigned runs. Once created, FXG notifies CSPs that the assigned run is available for any CSP interested to apply so the newly created run may be assigned to a CSP.

41. The primary way a CSP grows its business with FXG is by obtaining more runs. In every CSP contract, FXG and the CSP agree upon established rules and procedures by which a new assigned run will be awarded. This allows every CSP to expect the same process every time FXG makes a new assigned run available.

42. Typically, the truck of a CSP that has the most points receives the assigned run. Trucks that run assigned or unassigned runs earn points for each day. Trucks can also earn points for positive safety inspections and during peak season. Trucks can lose points for accidents. As such, the awarding of an assigned run should be based on merit.

43. MOWER's responsibility as Senior Linehaul Manager was to announce and award new assigned runs according to the process agreed upon by FXG and the CSP's as well as ensure the fairness and integrity of the process.

44. Instead, MOWER ensured that the SLTG co-conspirators' companies received runs in at least two different ways. First, SLTG was provided preferential treatment by MOWER in the daily assigning of FXG unassigned runs. Unassigned runs have set origins, but the destination changes daily and the mileage for the run varies based on the needs of FXG. The FXG dispatchers are supposed to assign these runs on a

rotating basis.

45.     Second, MOWER failed to announce newly available assigned runs, instead giving the SLTG co-conspirators assigned runs without initiating them through the awarding procedure.

46.     Beginning in or about 2009 and continuing until on or about January of 2018, Defendants BARSUKOV and TUCHINSKY made cash bribe payments to MOWER of approximately $3,000 per month and used telephone and text messages to set up meetings to deliver the bribes. Beginning no later than 2014, co-owners TOMILIN and TEYF each became knowing and willing participants in the ongoing bribes being paid to MOWER. Beginning in or about 2011, TSIPELZON became a knowing participant in the ongoing bribery scheme. BARSUKOV, TUCHINSKY, TOMILIN, TEYF, and TSIPELZON used the telephone and text messages to discuss the bribes. TEYF would regularly call co-conspirators in Utah to ask about the status of the trucking businesses, the success of the ongoing conspiracy, and the future returns on TEYF's investment in SLTG. Below is a summary of the frequency of telephone calls and text messages between TEYF using telephone numbers XXX-XXX-6818 and XXX-XXX-1141 and co-conspirators in Utah and California:

| Target Number | Dates and Approximate Number of Contacts with -6818 | Dates and Approximate Number of Contacts with -1141 |
|---|---|---|
| Yevgeny Tuchinsky (cell) – XXX-XXX-9493 | 11/23/2016-10/13/2017 11 calls or texts | 03/12/2015-11/02/2018 96 calls or texts |
| Alexsander Barsukov (cell) – XXX-XXX-4782 | 10/27/2016- 09/10/2018 255 calls or texts | 03/02/2015-11/30/2018 1055 calls or texts |

| Konstantin Tomilin (cell) – XXX-XXX-2393 | 11/06/2016- 06/29/2018 206 calls or texts | 03/01/2015-11/12/2018 163 calls or texts |
|---|---|---|
| Felix Tsipelzon (cell) – XXX-XXX-9501 | 10/18/2017- 05/18/2018 17 calls or texts | 03/11/2015- 09/04/2018 29 calls or texts |

47.     On or about 2014, TOMILIN caused multiple emails to be sent to him in Russia, originating in Salt Lake City, Utah. The emails contained information related to the conspiracy and detailed SLTG truck driver miles driven per run, and payroll statements. TOMILIN reviewed the documents and communicated about them by email with employees of SLTG in Salt Lake City.

48.     The SLTG co-conspirators and MOWER communicated by way of text messages and phone calls to further the object of the conspiracy. On May 3, 2018, MOWER had the following text message exchange with TUCHINSKY about TUCHISNKY being late on his bribe payments:

Mower:      Still waiting, and doing very poorly as a result. Something needs to change or I'm dead in the water.

Tuchinsky:   Will try on Tuesday

Mower:      I've heard that before. More than 3 months behind.

49.     By text message dated May 10, 2018, MOWER assured TSIPELZON that he would not post nine temp runs:

Mower:      I am not going to post the 4 Umatilla, lima, parowan, 3/stpl/spok runs (one is assigned already) that you [Tsipelzon] are running. There may be others. Just letting you know.

50.     On July 8, 2018, MOWER had the following text message exchange with TSIPELZON about the preferential treatment TSIPELZON was receiving:

| Tsipelzon: | You think that "equitable situation" is already here?!! I'm seeing it. You've gotta be kidding yourself when you say this isn't a catastrophe already. |
|---|---|
| Mower: | Not kidding myself. I have the facts. You get way more work than the rules would allow. |

* * *

| Mower: | You got 19 runs. We had a total of 24 total. You got almost 80% of the total amount of work, should have been closer to 50 or so to be equitable. Not sure what your expectations are beyond that. I don't have a magic wand. |
|---|---|

51.     At the request of BARSUKOV and TUCHINSKY and in exchange for a cash bribe, MOWER awarded the SLTG co-conspirators an assigned team run from Salt Lake City to St. Paul, Minnesota, to Spokane, Washington, without posting the run to allow other CSPs to compete for the run as required by FXG policy.

52.     For a period of approximately five years, in furtherance of the conspiracy and as a result of the bribes paid to him by his co-conspirators, MOWER allowed the SLTG co-conspirators to keep the following nine unauthorized assigned runs that should have been reclassified as assigned runs and posted for other CSPs to compete for them as required by FXG policy:

53.     A solo run from Salt Lake City to Parowan, Utah, for a weekly total of 2,400 miles and a gross weekly income of approximately $4,000.

54.     A solo run from Salt Lake City to Lima, Montana, for a weekly total of 2,800 miles and a weekly gross income of approximately $4,700.

55.     Four solo runs from Salt Lake City to Umatilla, Oregon, for a weekly total of 10,000 miles and a weekly gross income of approximately $17,000.

56.     Three team runs from Salt Lake City to St. Paul, Minnesota, then to Spokane, Washington, and back to Salt Lake City for a total of 12,000 weekly miles for the 3 runs and a weekly gross income of approximately $20,000.

57.     From at least January 1, 2017 through July 31, 2018, the defendants submitted weekly wire transmissions for settlement for SLTG to receive payments from FXG. These weekly settlement wires subsequently caused interstate wire payments to be transmitted from FXG to each of the SLTG FXG CSP's.

58.     On February 27, 2019, TUCHINSKY met with MOWER and offered him a bribe of $50,000 per assigned run in the form of an ownership interest for MOWER in SLTG.

## Manipulating the FXG Point System

59.     With each additional run SLTG obtained through fraud and bribes, SLTG also earned additional truck points within the FXG point system which enabled SLTG to compete for additional future FXG runs. In addition, the SLTG co-conspirators engaged in concealment and fraud by falsifying accident reports to FXG, which allowed SLTG to not lose truck points.

60.     On October 11, 2018, TSIPELZON and MOWER exchanged text messages discussing an accident one of the SLTG trucks had in Industry, California. TSIPELZON requested to have SLTG fix the damage themselves and not report it to FXG. The texts state:

Tsipelzon:    I don't wanna get hit with a safety bonus and points, so yeah – we'll fix it ourselves.

Mower:     I've got you [covered].

61.     Without MOWER's assistance, the SLTG co-conspirators would not have been able to obtain and retain routes and grow as they did.

## Bribing of Other FXG Dispatchers

62.     In or about 2009 and continuing for more than three years, UCC-1 and UCC-2, employees of FXG, received between 750 and 1,000 bribe payments from TUCHINSKY, BARSUKOV, and TSIPELZON, totaling approximately $20,000.00. These cash payments were given to UCC-1 and UCC-2 for additional unassigned runs that UCC-1 and UCC-2 were able to identify and assign to SLTG Ground.

63.     The SLTG co-conspirators and UCC-1 and UCC-2 regularly communicated with one another by telephone calls and text messages.

64.     UCC-1 and UCC-2, at the request of the SLTG co-conspirators, regularly contacted FXG hubs and stations by telephone in other states to seek additional runs for SLTG. UCC-1 and UCC-2 received additional bribe payments for each additional run they were able to locate and have assigned to the SLTG.

## Hiding the True Growth of the Businesses

65.     MOWER helped the SLTG co-conspirators grow their businesses larger than FXG allowed by submitting false information to FXG.

66.     Generally, FXG limits the number of semi-trucks ("tractors") a CSP owner may have service runs originating from the same hub to fifteen. A CSP may seek an exception to have more.

67.     FXG does this for many reasons. It protects FXG from becoming too dependent on one CSP in a given area. It allows FXG to spread opportunities available among more local trucking companies. It grants FXG access to more trucking resources that can support its transportation network.

68.     FXG depends on its senior linehaul managers to prevent CSPs from growing too large at a single hub. When a CSP gets too big at a particular hub, FXG refers to this as over-scale.

69.     Rather than follow company protocol and seek an exception to have additional tractors, MOWER and the SLTG co-conspirators regularly and systematically concealed the SLTG co-conspirators' true ownership interests and control of several CSPs from FXG by listing other individuals as the owner of the CSP. By doing so, the SLTG co-conspirators' companies operated approximately 70 runs originating from the North Salt Lake FXG hub.

70.     FXG Contract Service Providers are required to submit Annual Compliance Reports, certifying that they have updated their CSP Entity Profile. In or about April of 2017, in furtherance of the conspiracy between the SLTG co-conspirators and MOWER as well as other unnamed co-conspirators, to enable SLTG to operate over scale, the SLTG co-conspirators submitted eight fraudulent and inaccurate Annual Compliance Reports and Entity Profiles. This enabled SLTC to conceal from FXG the true ownership and nature of each of the SLTG trucking companies. The Annual Compliance Reports were submitted by interstate wire transmissions through FXG's MyGroundBiz.com.

71.    In or about April of 2019, in furtherance of the conspiracy between the SLTG co-conspirators and MOWER as well as other unnamed co-conspirators, to enable the SLTG to operate over scale, SLTG co-conspirators submitted eight fraudulent and inaccurate Annual Compliance Reports and Entity Profiles.  This enabled SLTG to conceal from FXG the true ownership and nature of each of the SLTG trucking companies.  The Annual Compliance Reports were submitted by interstate wire transmissions through FXG's MyGroundBiz.com.

### Boosting Miles and Ghost Routes

72.    Using MOWER's position, the SLTG co-conspirators and MOWER falsified mileage reports so that FXG paid the SLTG co-conspirators' companies more than they were entitled.

73.    A CSP earns money by completing runs for FXG.  The total weekly mileage of the runs completed by a CSP is multiplied by a dollar amount per mile.  Thus, the more miles driven, the more money earned.

74.    MOWER on occasions would inflate, or boost, the number of weekly miles driven by one of more of the SLTG co-conspirators' companies and submit the boosted numbers to FXG, causing FXG to overpay the SLTG co-conspirators.

75.    In addition, the SLTG co-conspirators' trucking companies received payments from FedEx Ground for "ghost routes" or runs that were never actually run by one of their trucking companies.

76.    On April 24, 2018, MOWER and TSIPELZON exchanged text messages

confirming that he had altered the miles of a SLTG run from 2360 to 2932, knowing that the run had only run 2360 miles. This action caused FXG to pay SLTG for 572 miles that were not actually traveled. TSIPELZON's text responding to this includes a thumbs up emoji, the words "you are so awesome," and a clapping hands emoji.

77.    On April 18, 2018, MOWER and TSIPELZON exchanged text messages confirming that a SLTG truck was paid for a "Denver round trip on 4/5 that did not take place." The result was a payment being made by FXG to SLTG in the amount of $1850.00. The text from MOWER to TSIPELZON states "[t]hat's $1850 for free. Let Eugene know."

### Results of the Wire Fraud Conspiracy

78.    By fraudulently obtaining assigned runs, obtaining preferential treatment on unassigned runs, allowing the continuous running of unauthorized runs, manipulating the truck points system, falsely reporting accidents, actively obscuring business ownership and growth, and falsely reporting miles to gain unearned income, the SLTG co-conspirators' received approximately $150,000,000 in US Linehaul revenue from FXG during the approximate ten year period of the conspiracy. During that same time period, the SLTG co-conspirators paid bribes to UCC-1 and UCC-2 of approximately $20,000 and paid bribes to MOWER of approximately $300,000.

All in violation of 18 U.S.C. §§ 1343 and 1349.

**Counts 2-12**
18 U.S.C. §§ 1956(a)(1)(A)(i) and 2
(Promotional Money Laundering)

79.    The allegations set forth in paragraphs 1-78 of the Superseding Indictment are incorporated by reference and re-alleged as though fully set forth herein.

80.    On or about the dates alleged below, within the Central Division of the District of Utah,

YEVGENY TUCHINSKY,
ALEXSANDER BARSUKOV,
KONSTANTIN TOMILIN,
LEONID TEYF, and
FELIX TSIPELZON,

the defendants herein, did knowingly conduct and attempt to conduct the following financial transactions affecting interstate commerce, which transactions involved the proceeds of specified unlawful activity, that is, wire fraud conspiracy in violation of 18 U.S.C. §§ 1343 and 1349, and money laundering in violation of 18 U.S.C. §§ 1956 and 1957, with the intent to promote the carrying on of such specified unlawful activity and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity all in violation of 18 U.S.C. §§ 1956(a)(l)(A)(i) and 2(a) and 2(b):

| COUNT | DATE (On or About) | MONETARY TRANSACTIONS |
|-------|--------------------|----------------------|
| 2 | October 26, 2105 | A & Y's AFCU account 7165-9.9 (checking) transferred $62,254.00 in criminal proceeds to A & Y's AFCU's 7165-9.1 (savings) account. |
| 3 | November 19, 2015 | A & Y's AFCU account 7165-9.9 (checking) transferred $50,000.00 in criminal proceeds to A & Y's AFCU's 7165-9.1 (savings) account. |

| | | |
|---|---|---|
| 4 | January 14, 2016 | A & Y's AFCU account 7165-9.9 (checking) transferred $60,000.00 in criminal proceeds to A & Y's AFCU's 7165-9.1 (savings) account. |
| 5 | May 20, 2016 | A & Y's AFCU account 7165-9.1 (savings) transferred $890,000.00 in criminal proceeds to A & Y's AFCU's 7165-9.9 (checking) account. Memo line states "return on investment." |
| 6 | May 20, 2016 | A & Y's AFCU account 7165-9.9 (checking) issued check #100 to TEYF in the amount of $900,000.00 and the memo line states "return on investment." TEYF deposited this check into his WFB account ending in 5155. |
| 7 | March 23, 2015 | Costa Transportation's AFCU 7748-9.9 (checking) issued check #1404 in the amount of $100,000, deposited into Salt Lake Commercial Properties AFCU account 5665-5.1 (savings) |
| 8 | March 24, 2015 | Salt Lake Commercial Properties AFCU account 5665-5.1 (savings) transferred $205,512.01 to Alta Title. |
| 9 | June 24, 2015 | Costa Transportation's AFCU 7748-9.9 (checking) sent a $200,000.00 wire transfer to Transportation Staffing Solutions" Brighton Bank accounting ending in 3323. |
| 10 | June 24, 2015 | A & Y's AFCU account 7165-9.9 (checking) sent a $39,375.00 wire transfer to Transportation Staffing Solutions" Brighton Bank accounting ending in 3323. |
| 11 | June 24, 2015 | Eugeny Trucking's (now known as Eugene Trucking) WFB 1695 sent a wire transfer in the amount of $36,250.00 to Transportation Staffing Solutions' Brighton Bank accounting ending in 3323. |
| 12 | July 15, 2015 | Transportation Staffing Solutions' Brighton Bank accounting ending in 3323 transferred $309,088.49 to pay off an existing loan on the property for the business. |

**Counts 13-16**
18 U.S.C. §§ 1957 and 2
(Money Laundering - Spending)

81.     The factual allegations set forth in paragraphs 1-80 of the Superseding

Indictment are incorporated by reference and re-alleged as though fully set forth herein.

82.     On or about the dates alleged below, in the Central Division of the District

of Utah, and elsewhere,

YEVGENY TUCHINSKY,
ALEXSANDER BARSUKOV,
KONSTANTIN TOMILIN,
LEONID TEYF, and
FELIX TSIPELZON,

defendants herein, did knowingly engage and attempt to engage in the following

monetary transactions by, through and to a financial institution, affecting interstate and

foreign commerce, in criminally derived property of a value greater than $10,000.00, that

is the withdrawal, transfer, exchange of U.S. currency, and deposit of funds, such

property having been derived from a specified unlawful activity, that is, the proceeds of

Wire Fraud Conspiracy in violation of 18 U.S.C. §§ 1343 and 1349; all in violation of

Title 18 U.S.C. §§ 1957 and 2:

| COUNT | DATE (On or About) | MONETARY TRANSACTIONS |
|-------|--------------------|-----------------------|
|       |                    |                       |

| 13 | August 21, 2015 | Eugene Tuchinsky purchased a 2.55 carat diamond ring from Tiffany and Co. in the amount of $179,550.00, charged to his Eugene Trucking American Express Card. The balance for the Eugene Trucking American Express Card balance was paid for by Eugeny Trucking's WFB account ending in 1695. |
|---|---|---|
| 14 | November 10, 2015 | Barsukov purchased a 28' Regulator from Kusler Yacht. A wire transfer in the amount of $219,124.91 was sent from A & B's AFCU 0421-3.1 (savings) to Kusler Yacht as a partial payment. |
| 15 | February 16, 2016 | Barsukov purchased a 2.1ct Blue Nile Diamond for $48,256.00 on the A & B Transportation American Express Card. An online payment to American Express was made by A & B's AFCU account ending in 0421-3.9 (checking) in the amount of $67,072.26 to pay the balance on the card. |
| 16 | October 15, 2019 | Barsukov sold his real property located at 3555 E Sutton Court, Sandy, Utah and received a $98,745.72 down payment into his personal AFCU account ending in 228-6.7 and obtained a trust deed for $494,500. |

## TOMILIN'S POST INDICTMENT MONEY LAUNDERING

83.     The factual allegations set forth in paragraphs 1-82 of the Superseding Indictment are incorporated by reference and re-alleged as though fully set forth herein.

84.     In August of 2018, TOMILIN sold his interest in the FedEx Division of the SLTG to Teyf for $2.75 million. This $2.75 million constituted the proceeds of TOMILIN's criminal conduct, described above. TOMILIN, in turn, used $2 million from Teyf to buy FedEx Ground service provider contracts by purchasing IS Trucking and NB Logistics located in Pennsylvania. TOMILIN changed the names of these two trucking

companies to VT Trucking and MK Logistics and operated them out of Harrisburg or the Lehigh Valley, Pennsylvania.

85.     On December 11, 2019, defendant TOMILIN and his counsel met with counsel for the United States Attorney's Office and Federal Agents. At the meeting, counsel for the United States informed TOMILIN both verbally and in writing that the United States would be pursing the seizure and forfeiture of the assets he had obtained from his participation in the bribery and fraud scheme alleged in this case.

86.     On April 1, 2020, the United States obtained an amended restraining order from the United States District Court to preserve the payments I.G. owed for the purchase from TOMILIN of FedEx Ground runs held by VT Trucking and MK Logistics for $1,800,000. The amended restraining order was served on counsel for TOMILIN on April 1, 2020.

ELPENN Purchases.

87.     ELPENN Inc. is a Pennsylvania corporation that was incorporated on April 5, 2018. Its principal place of business is in Mount Wolf, Pennsylvania. ELPENN is a contracted service provider for FedEx Ground and hauls packages for FedEx Ground.

88.     Evolve Logistics Group Inc. is a corporation headquartered in New Jersey that operates numerous FedEx Ground contracted service provider companies, including ELPENN, along the east coast.

89.     On April 20, 2020, TOMILIN agreed to sell five FedEx Ground team runs of VT Trucking to ELPENN for $477,000. Under the terms of the agreement, ELPENN

agreed to pay $100,000 to TOMILIN when the request was made to FedEx Ground to transfer the runs to ELPENN and an additional amount of $377,000 when Fed Ex Ground approved the transfer of the runs.

90. On April 28, 2020, TOMILIN agreed to sell two FedEx Ground team runs and eight assigned runs of ~~VT Trucking~~ MC Logistics to ELPENN for $593,000. Under the terms of the agreement, ELPENN agreed to pay $100,000 to TOMILIN when the request was made to FedEx Ground to transfer the runs to ELPENN and an additional amount of $493,000 when FedEx Ground approved the transfer of the runs.

91. On April 30, 2020, ELPENN sent a wire from its TriState Capital Bank account ending in 7412 in the amount $200,000 to the VT Trucking Bank of America account ending in 5041.

92. On June 29, 2020, ELPENN sent a wire from its TriState Capital Bank account ending in 7412 in the amount $773,138.78 to the VT Trucking Bank of America account ending in 5041.

### Counts 17-23
18 U.S.C. §§ 1957 and 2
(Money Laundering - Spending)

93. The factual allegations set forth in paragraphs 1-92 of the Superseding Indictment are incorporated by reference and re-alleged as though fully set forth herein.

93. On or about the dates alleged below, in the Central Division of the District of Utah, and elsewhere,

KONSTANTIN TOMILIN,

defendant herein, did knowingly engage and attempt to engage in the following monetary transactions by, through and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000.00, that is the withdrawal, transfer, exchange of U.S. currency, and deposit of funds, such property having been derived from a specified unlawful activity, that is, the proceeds of Wire Fraud Conspiracy in violation of 18 U.S.C. §§ 1343 and 1349; all in violation of Title 18 U.S.C. §§ 1957 and 2:

| COUNT | DATE (On or About) | MONETARY TRANSACTIONS |
|-------|--------------------|-----------------------|
| 17 | 4/30/2020 | ELPENN sent a wire from its TriState Capital Bank account ending in 7412 for $200,000 to the VT Trucking Bank of America account ending in 5041 for the purchase of runs from VT Trucking. |
| 18 | 5/01/2020 | TOMILIN wrote check no. 1001 from the VT Trucking Bank of America account ending in 5041 for $40,000 to the Utah State Tax Commission. |
| 19 | 6/10/2020 | TOMILIN made an online payment of $160,000 from the VT Trucking Bank of America account ending in 5041 to the Internal Revenue Service. |
| 20 | 6/29/2020 | ELPENN sent a wire from its TriState Capital Bank account ending in 7412 for $773,138.78 to the VT Trucking Bank of America account ending in 5041 for the purchase of runs from VT Trucking. |
| 21 | 6/29/2020 | TOMILIN wrote check no. 1004 from the VT Trucking Bank of America account ending in 5041 for $41,484 to pay M.V. his 2019 dividend. |
| 22 | 7/06/2020 | TOMILIN wrote check no. 1008 to himself from the VT Trucking Bank of America account ending in 5041 for $19,452 to pay |

| | | |
|---|---|---|
| | | TOMILIN the remainder of his 2019 K-1 and deposited the check into his account at the University Credit Union account ending in XXXX |
| 23 | 7/07/2020 | TOMILIN made an online payment of $218,864 from the VT Trucking Bank of America account ending in 5041 to the Internal Revenue Service. |

## NOTICE OF INTENT TO SEEK FORFEITURE

Pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), upon conviction of any offense in violation of 18 U.S.C. § 1343 or 1349, as set forth in this Superseding Indictment, the defendant shall forfeit to the United States of America any property, real or personal, that constitutes or is derived from proceeds traceable to the scheme to defraud and/or the conspiracy. The property to be forfeited includes, but is not limited to, the following:

- Real property located at:

  - 5745 W 300 S, Salt Lake City, UT;

  - 1624 Caminito Solidago, La Jolla, CA, 92037;

  - 3424 E. Hidden Oaks Dr., Cottonwood Heights, UT;

  - 8245 The Landing Way, San Diego, CA 92127; and

  - 99 W South Temple #1205, Salt Lake City, UT 84101.

- A money judgment equal to the value of any property, real or personal, constituting or derived from proceeds traceable to the scheme to defraud/conspiracy and not available for forfeiture as a result of any act or

omission of the defendant(s) for one or more of the reasons listed in 21 U.S.C. § 853(p); and

- Substitute property as allowed by 21 U.S.C. § 853(p) via 28 U.S.C. § 2461(c).

Pursuant to 18 U.S.C. § 982(a)(1), upon conviction of any offense in violation of 18 U.S.C. §§ 1956 and/or 1957, the defendants shall forfeit to the United States of America any property, real or personal, involved in such violations, and any property traceable to such property. The property to be forfeited includes, but is not limited to the following:

- Alexsander Vasiliyevich Barsukov's interest in a trust deed and/or promissory note dated on or about October 15, 2019, for $494,500 and all payments that A.C., M.R., and D.A. owe to Alexsander Vasiliyevich Barsukov under such deed/note.

- A money judgment equal to the value of all property involved in the money laundering and any property traceable to such property and not available for forfeiture as a result of any act or omission of the defendant(s) for one or more of the reasons listed in 21 U.S.C. § 853(p).

- Substitute property as allowed by 21 U.S.C. § 853(p) via 18 U.S.C. § 982(b).

## GRAND JURY'S PROBABLE CAUSE FINDING REGARDING FORFEITURE

The grand jury finds probable cause to believe that:

1) Alexsander Vasiliyevich Barsukov has committed the crimes specified in the above forfeiture notice;

2) The following property is 1) constituted or derived from proceeds traceable to the wire fraud scheme, or 2) involved in money laundering or property traceable to property involved in money laundering; and

3) In the event of Mr. Barsukov's conviction such property would be subject to forfeiture:

- Alexsander Vasiliyevich Barsukov's interest in a trust deed and/or promissory note dated on or about October 15, 2019, for $494,500 and all payments that A.C., M.R., and D.A. owe to Alexsander Vasiliyevich Barsukov under such deed/note.

A TRUE BILL:

_____/G/_____
FOREPERSON OF THE GRAND JURY

JOHN W. HUBER
United States Attorney

_____Cy H. Castle_____
KEVIN L. SUNDWALL
JAMIE THOMAS
CY H. CASTLE
Assistant United States Attorneys